**RECORD NO. 14-1402**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

USA TROUSER, S.A. DE C.V.,

*Plaintiff - Appellant,*

v.

SCOTT ANDREWS,

*Defendant - Appellee,*

INTERNATIONAL LEGWEAR GROUP, INC.;
WILLIAM SHEELY AND JOHN SANCHEZ,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE

**OPENING BRIEF OF APPELLANT**

Matthew K. Rogers
LAW OFFICES OF MATTHEW K. ROGERS, PLLC
P.O. Box 9096
Hickory, NC 28603
(828) 327-2005
rogersmk@mrbizlaw.com

*Counsel for Plaintiff-Appellant*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1402__      Caption: _USA Trouser S.A. de C.V. v. Scott Andrews et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_USA Trouser S.A. de C.V._
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
         If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐ YES ☑ NO
         If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _Matthew W. Rogers_    Date: _____May 12, 2014_____

Counsel for: USA Trouser S.A. de C.V.

## CERTIFICATE OF SERVICE
****************************

I certify that on _____May 12, 2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Dana Lumsden
Bradley Arant Boult Cummings, LLP
Bank of America Corporate Center
100 N. Tryon Street, Suite 2690
Charlotte, NC 28202

dlumsden@babc.com

_Matthew W. Rogers_                    _____May 12, 2014_____
(signature)                                             (date)

- 2 -

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES..........................................iii

JURISDICTIONAL STATEMENT........................................1

STATEMENT OF THE ISSUES........................................2

SUMMARY OF ARGUMENT............................................3

STATEMENT OF FACTS.............................................5

    A.   Introductory and Background Facts .......................5
    B.   Relevant Procedural Facts .............................19

SUMMARY OF ARGUMENT...........................................25

ARGUMENT......................................................26

    I.   STANDARD OF REVIEW ...................................26

    II.  DISCUSSION OF ISSUES .................................28

        A.   THE TRIAL COURT ERRED BY FAILING TO GRANT USAT'S
            SUMMARY JUDGMENT THAT ANDREWS OWED USAT FIDUCIARY
            DUTIES AND BREACHED THOSE FIDUCIARY DUTIES
            THEREBY COMMITING CONSTRUCTIVE FRAUD ..............28

            1.   Andrews Owed Fiduciary Duties to USAT
                Arising Out of ILG's Relationship With ILG
                As Well As Andrews Commitments By And
                Through HEP Which Caused USAT To Become
                Dependent on ILG for the Wal-Mart and
                Payless Partnership Programs .................28
            2.   The Trial Court Erred by Failing To
                Recognize At the Summary Judgment Stage that
                ILG was Insolvent and During Insolvency
                Andrews Fiduciary Duties Flowed Directly to
                USAT .......................................35
            3.   The Trial Court Erred by Failing to find
                  Unrefuted Evidence Proved Andrews Breached
                the Fiduciary Duties to USAT .................39

i

B.    THE TRIAL COURT FAILED TO FIND THAT ANDREWS
      BREACHED FIDUCIARY DUTIES OWING TO USAT ...........43

C.    ANDREWS TORTIOUSLY BENEFITTED FROM CONTINUED
      OPERATION OF ILG AND CAUSING ILG TO SELL ASSETS
      AT A FIRE SALE PRICE ..............................45

D.    THE TRIAL COURT ERRED BY FAILING TO FIND ANDREWS
      BREACHED STATUTORY PROCEDURES TO ORDERLY WIND-UP,
      LIQUIDATE ASSETS, AND PAY DEBTS ...................48

E.    ANDREWS'S CONDUCT IN BLEEDING ILG FOR HIS OWN
      BENEFIT, BREACHING FUDICARY DUTIES AND IGNORING
      PUBLIC POLICY REGARDING FAILING BUSINESSES AMOUNT
      TO UNFAIR AND DECEPTIVE TRADE PRACTICES ..........52

CONCLUSION.....................................................55

CERTIFICATE OF COMPLIANCE......................................56

CERITFCATE OF SERVICE..........................................57

## TABLE OF AUTHORITIES

### CASES

*Adams v. Trustees of the University of N.C.-Wilmington*,
    640 F.3d 550 (4th Cir. 2011)...............................27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct.
    2505, 91 L. Ed. 2d 202 (1986)..............................26

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
    346 F.3d 514 (4th Circuit 2003)............................26

Casey v. Grantham,
    239 N.C. 121, 79 S.E.2d 735 (1954).........................29

*Chatham v. Mecklenburg Realty Co.*,
    180 N.C. 500, 105 S.E. 329 (1920)..........................51

*Dalton v. Camp*,
    353 N.C. 647, 548 S.E.2d 704 (2001)................28-29, 53

*EEOC v. North America Land Corp.*, No.
    1:08-cv-501, 2010 WL 2723727 (W.D.N.C. Jul. 8, 2010)......28

*Federal Deposit Insurance Corp. v. Sea Pines Co.*, 692 F.2d
    973 (4th Cir.1982).........................................35

*Forbis v. Neal*,
    361 N.C. 519, 649 S.E.2d 382 (2007)........................43

*Glenn v. Wagner*,
    313 N.C. 450, 329 S.E.2d 326 (1985)........................37

Gray v. N.C. Ins. Underwriting Association,
    352 N.C. 61, 529 S.E.2d 676 (2000).........................53

*HAJMM Co. v. House of Raeford*,
    94 N.C. App. 1, 403 S.E.2d 868 (1989)......................29

*Hudgins v. Wasoner*,
    204 N.C. App. 480, 694 S.E.2d 436 (2010)...........37, 44, 52

*J&J Sports Productions, Inc. v. Romenski*,
    845 F. Supp. 703 (W.D.N.C. 2012)...........................27

iii

*Johnson v. Phoenix Mutual Life Insurance Company*,
    300 N.C. 247, 266 S.E.2d 610 (1980)....................53, 54

*Keener Lumber Company, Incorporated v. Pewy III*,
    149 N.C. App. 19, 560 S.E.2d 817 (2002)...............42, 47

*Marshall v. Miller*,
    302 N.C. 539, 276 S.E.2d 397 (1981)........................53

*McDonald v. Scarboro*,
    91 N.C. App. 13, 370 S.E.2d 680 denied, 323 N.C. 476,
    373 S.E.2d 864 (1988).......................................53

*Mikels v. Unique Tool & Manufacturing Co., Inc.*,
    2007 WL 4284727 (W.D.N.C. 2007)............................29

*Minnis v. Sharpe*,
    198 N.C. 364, 151 S.E. 735 (1930)..........................36

*Mitchell v. Linville*,
    148 N.C. App. 71, 557 S.E.2d 620 (2001)....................53

*Mitchell v. The Erin Mills Capital Corp. (In re Maxx Race
    Cards, Inc.)*,
    266 B.R. 74 (Bankr.W.D.N.C.1998)...........................36

*Overstreet v. Brookland, Inc.*
    52 N.C.App. 444, 279 S.E.2d 1 (1981).......................53

*Pepper v. Litton*,
    308 U.S. 295, 60 S. Ct. 238, 84 L. Ed. 281 (1939).........35

*Rossignol v. Voorhaar*,
    316 F.3d 516 (4th Cir. 2003)...............................27

Ragsdale v. Kennedy,
    286 N.C. 130, 209 S.E.2d 494 (1974)........................52

*Ryan v. Homecomings Finance Network*,
    253 F.3d 778 (4th Cir.2001)................................27

*Sara Lee Corp. v. Carter*,
    351 N.C. 27, 519 S.E.2d 308 (1999).........................54

Shaw v. Stroud,
    13 F.3d 791 (4th Cir.1994) denied, 513 U.S. 814, 115 S.
    Ct. 68, 130 L. Ed. 2d 24 (1994)............................26

iv

*Snyder v. Freeman*,
    300 N.C. 204, 266 S.E.2d 593 (1980)........................32

*Stamm v. Salomon*,
    144 N.C. App. 672, 551 S.E.2d 152 (2001)..................29

*State ex rel. Howes v. W.R. Peele, Sr. Trust*,
    876 F. Supp. 733 (1995)...................................52

*In re U.S. Digital, Inc.*,
    443 B.R. 22 (Bankr.D.Del 2011)...........................35

*Underwood v. Stafford*,
    270 N.C. 700, 155 S.E.2d 211 (1967)......................36

*Vail v. Vail*,
    233 N.C. 109, 63 S.E.2d 202 (1951)
    *114*, 63 S.E.2d at 205-206 (quoting 37 C.J.S., Fraud, s
    16, p. 247)..............................................29

*Watts v. Cumberland County Hospital System, Inc.*,
    317 N.C. 110, 343 S.E.2d 879 (1986)......................30

*Wilder v. Squires*,
    68 N.C.App. 310, 315 S.E.2d 63 (1984)....................53

**STATUTES & RULES**

11 U.S.C. § 546 ...........................................48
28 U.S.C. § 1291...........................................2
28 U.S.C. § 1332...........................................1

Bankruptcy Code Section 546(c)............................48

Fed.R.Civ.P. 8(b)(6)......................................27
Fed.R.Civ.P. 54(b).........................................2
Fed.R.Civ.P. 56(c)........................................26

N.C.G.S. §25-2-702........................................43
N.C.G.S. §39-23.3(b)......................................43
N.C.G.S. §55-14-02........................................50
N.C.G.S. §55-14-03........................................50
N.C.G.S. §55-14-05........................................50
N.C.G.S. §55-14-06........................................50
N.C.G.S. §55-14-08(a)(2)..................................51
N.C.G.S. §75-1........................................26, 53
N.C.G.S. §75-16...........................................55

Va. Code §13.1-752.............................................51
Va. Code §13.1-753.............................................51
Va. Code §13.1-755.........................................50, 51

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————
No. 14-1402
(1:11-cv-00244-MR-DLH)
————————————

USA Trouser, S.A. de C.V.,

          Appellant,

v.

Scott Andrews,

          Appellee.

---

**Appellant's Opening Brief**

---

## JURISDICTIONAL STATEMENT

The United States District Court for the Western District had jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff-Appellant USA Trouser, S.A. de C.V.'s ("USAT") sought joint and several liability for the claims as to four named defendants. On December 14, 2012, the United States District Court for the Western District of North Carolina entered Memorandum of Decision and Order ("Order") denying Motion for Summary Judgment against one of the four defendants, that is Defendant Scott Andrews ("Andrews") and granting Andrews's Motion for Summary Judgment with respect to all claims against Andrews.

USAT appeals the interlocutory summary judgment order as to Andrews (not a final judgment contemplated by 28 U.S.C. §1291) rendered prior to the entry of final judgment.  Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Summary Judgment Order as to one defendant was for fewer than all of the claims and for fewer than all of the parties.  Other than Andrews, judgments against Co-Defendants William Sheely ("Sheely") and John Sanchez ("Sanchez") were entered on January 3, 2013, and Judgment against International Legwear Group, Inc. ("ILG") for fraud and unfair and deceptive trade practices was entered on March 25, 2014.  Final judgment and order as to all parties and all claims was entered on March 25, 2014.  USAT timely appealed the District Court's Order on April 24, 2014.  This Court has jurisdiction pursuant to 28 U.S.C. §1291, which governs appeals from final judgment.  The judgments against Defendants William Sheely, John Sanchez nor International Legwear Group, Inc. are not appealed or should be disturbed by this appeal.

## STATEMENT OF THE ISSUES

**I.**   Did The Trial Court Err By Granting Defendant Scott Andrews's Summary Judgment With Respect To All Claims Against Scott Andrews?

**II.**  Did The Trial Court Err By Denying Plaintiff USA Trouser's Motion For Summary Judgment For All Claims Against Andrews?

2

**III.** Did The Trial Court Err By Finding That Defendant Scott Andrews Did Not Owe Fiduciary Duties To Plaintiff USA Trouser When ILG Was Financially Insolvent?

**IV.** Did The Trial Court Err By Finding That Defendant Scott Andrews Did Not Have Duties To Notify Creditors Or Dispose Of ILG's Liabilities In A Statutorily Proscribed Manner?

**V.** Did The Trial Court Err By Prematurely Finding That Defendant Scott Andrews Is Not Liable To Plaintiff USA Trouser For Judgment Entered Against ILG?

**VI.** Is Andrews Liable For Interest Owing On The Trial Court's Judgment Against ILG?

## SUMMARY OF ARGUMENT

Defendant Scott Andrews ("Andrews") formed International Legwear Group, Inc. and operated International Legwear Group, Inc. ("ILG") as the Chairman of ILG's board of directors. From 2006 until 2011, ILG was "continually in cash flow crisis and experienced several and repeated defaults on its payment obligations under certain credit and loan agreements it had with its primary lender ("CapSource")." JA 2787. While ILG was "cash flow" and balance sheet insolvent, Andrews was responsible for ILG's banking relationships and shareholder relationships. During this timeframe, Andrews had fiduciary duties to USAT arising both from (1) fiduciary duties directors owed to creditors when ILG was insolvent, and (2) ILG's vertically integrated "strategic partnership" with USAT.

By the beginning of March 2011 (at the latest), Andrews knew ILG was both balance sheet and cashflow insolvent.

3

CapSource notified Andrews of CapSource's intent to stop lending ILG's "revolving" operational cashflow needs. Rather than disclose ILG's condition to creditors, Andrews and ILG's officers concealed ILG's financial condition from Plaintiff-Appellant USA Trouser S.A. de C.V. ("USAT") so that USAT would continue to supply products. For the next four (4) months, Andrews conspired with ILG's officers to fraudulently promise USAT payments that ILG could not make. In July 2011, rather than cause ILG to follow corporate wind-up procedures or file for bankruptcy protection, Andrews tortiously disregarded his fiduciary duties owed to USAT and disregarded statutory responsibilities. Andrews negotiated the sale of ILG's assets including consigned inventory from USAT so that Andrews could cause ILG to pay select debts, including payment of director and officer liability insurance premiums intended to benefit Andrews. Neither ILG nor the third party buyer paid USAT for the products ordered by ILG (and consigned to ILG) or other damages USAT incurred due to Andrews' and ILG's fraud. Andrews continued to ensure ILG's director and officer liability insurance was paid even after the lawsuit was filed and continues to improperly benefit from preference payments made for such insurance. Unrefuted evidence establishes that USAT is entitled to $2,123,000.00 in compensatory and consequential damages. JA 167-169. USAT's damages should be increased by interest and

4

damages to be trebled and USAT awarded attorney fees as permitted by N.C.G.S. §75-16.1.

## STATEMENT OF FACTS

**A. Introductory and Background Facts.**

Plaintiff USA Trouser, S.A. de C.V. ("USAT") is a Mexican manufacturer of trouser socks owned by the Balas family. Over many years, Jaime Balas ("Jaime") and his two sons Juan Balas ("Juan") and Salomon ("Salomon") developed a "strategic partnership" with Ellis Hosiery ("Ellis") to supply "trouser" socks to Wal-Mart. Ellis was a Hickory, North Carolina sock manufacturer who started supplying Wal-Mart with "dress" or "trouser" socks in about 2000. Supplying Wal-Mart's "trouser sock" needs required specialized knitting capacity, close enough to the US market to keep transportation costs low, while also allowing for quicker replenishment for Wal-Mart needs on shorter notice than Asian-suppliers could provide. JA 158, ¶6. Ellis recognized that Ellis needed to develop a special relationship with a dependable, lower-cost manufacturer if Ellis would retain the business. JA 437-439, ¶¶ 4-11.

Recognizing the unique manufacturing capabilities of the Balas family and proximity to U.S. markets, Ellis asked Jaime to partner with Ellis to supply all of Wal-Mart's trouser sock needs. The owner of Ellis met with Jaime in 2000. JA 437-438, ¶¶4, 7-9. Relying on volume commitments, exclusivity of supply

5

and personal guarantees of Ellis's owners, the Balas family started the process of integrating the Balas's unique manufacturing operations with Ellis's sales, store-specific fulfillment capabilities and customer services.  JA 157-159, ¶¶4-11 and JA 437-438, ¶¶4-10.  Some of the initial integration included: (1) joint-design of trouser socks for each season; (2) joint raw material planning; (3) sharing detailed confidential information of Wal-Mart's projections and stocking needs; (4) coordinating logistics and (5) a direct "planning link-up" between ILG's production planners USAT's "manufacturing group." JA 438-441, ¶¶ 10, 23.  Initial integration goals included timely sharing of confidential customer information so that USAT could adjust its production schedules and labor force over the course of a full year ("lineal production") to reduce costs, thereby improving profit margins for trouser socks. JA 159, ¶¶9-12.  This model relied on Ellis timely sharing Wal-Mart's confidential information. JA 158-159, ¶¶8-11 and JA 441-442, ¶ 25, 32. The product design, selection and manufacturing decision was a cooperative effort involving close cooperation between ILG and USAT. Id. ILG would send USAT pictures of designs, and USAT would prepare samples for Wal-Mart agreed upon with ILG personnel. It took approximately 2 months for every new buying season to develop the samples, and learn how to make the samples on USAT's machines. Because of the delivery times for the

6

various retail selling seasons, timely getting Wal-Mart decisions were critical. JA 206, ¶12.  Wal-Mart inspected USAT's operations to ensure production met Wal-Mart's standards.  After the Wal-Mart production partnership proved successful, Ellis used the same model to obtain Payless Shoes trouser sock business. JA 159, ¶11. By 2005, the strategic partnership to service Wal-Mart and Payless Shoes (together, "Partnership Programs") accounted for more than 90% of USAT's production capacity. JA 160, ¶20.

Andrews is a sophisticated corporate executive with years of corporate finance and governance experience.  JA 275-280. Andrews was a partner and majority owner of Harvest Equity Partners, "a private equity management and advisory firm based in Middleburg, Virginia" (hereinafter, "HEP"). *Id*. Andrews business partners in HEP were Shannon Kennedy ("Kennedy") and Kevin Passerello ("Passarello"). HEP was capitalized with a total of $90,000.00 and HEP was the general partner of "Investment Partnerships" Andrews managed.  JA 2257:4-2258:24. Andrews worked closely with Passarello and Kennedy, with each being authorized to act on behalf of HEP (and each other), and never having "formal" Member meetings.  JA 2253:7-2255:18; JA 1471, ¶¶5-9.  HEP's business was to "manage portfolio companies" for two Investment Partnerships owned in part by HEP. JA 2256:1-2257:25.  The Investment Partnerships paid HEP a management fee

based on the asset value of each business owned by HEP. JA 2258:25-2260:6. In addition, HEP received a "management fee" directly from some of the companies owned by the Investment Partnerships for "services" HEP provided to the companies. JA 2260:24-2261:25. Andrews's compensation (from HEP) was determined based on a monthly draw, which draw relied on the "management fees" received from the companies. JA 2278:3-2279:15. Andrews characterized the management fee as payment for providing (1) consulting work; (2) organizational work; (3) strategic work, as well as (4) for sitting on ILG's board. JA 2266:3-2271:8. "Organizational" work included consulting as to cost structure and operational efficiency, recruiting personnel, establishing reporting structures, and financial oversight including monthly financial review. *Id.* "Strategic work" included acquisitions to create "verticals…in their industry". *Id.* Andrews provided analytics for "go to market….active work that anybody….with a significant ownership in a company" performs. JA 2268:7-14. HEP provided and secured legal advice for the businesses owned by the Investment Partnerships, including ILG. JA 2269:25-2271:21. ILG was the largest business in which HEP was invested or which paid HEP management fees. JA 2268:1-2269:22.

Andrews spear-headed the formation of and financing of International Legwear Group, Inc. ("ILG") to acquire hosiery

8

companies and consolidate the hosiery industry. Id.; JA 2285-2293. ILG was formed with less than $40 million in capital and more than $100 million in inventory-based debt financing. Id. Andrews was Chairman of ILG. ILG was a Virginia Corporation, but all operations were in North Carolina. Andrews owned ILG through two "private equity partnerships" called Winston/Thayer Partners, LP and Winston Equity Partner II, LP (together, "Investment Partnerships"). The Investment Partnerships were controlled by HEP. JA 2251:14-2319:25.

When Andrews was evaluating ILG purchasing Ellis Hosiery, USAT's strategic partnership and the Partnership Programs were a substantial part of Ellis's business valuation. JA 437-438 ¶¶1-13. The strategic partnership between USAT's owners and Ellis was an important part of the value of Ellis purchased by ILG. JA 438-439 ¶11. At that time, ILG's officers told USAT's owners that Andrews was (i) one of ILG's owners, (ii) was very wealthy, and (iii) personally guaranteed ILG's payments to USAT. JA 234, ¶5. ILG relied primarily (if not exclusively) on debt to finance the purchase of Ellis and operation of ILG. ILG paid HEP a separate management fee on a monthly basis. JA 2261:3-25; also JA 2265:20-25; and JA 2279:9-15. Andrews's HEP received $30,000.00 per month for the "Management Services". JA 410-411; JA 2261:3-25; also JA 2265:20-25; and JA 2279:9-15.

9

After purchasing Ellis, Neuville and PEDS, ILG's business was directed by HEP. As a HEP partner, Andrews was also Chairman of ILG's Board of Directors.  Andrews was personally responsible ILG's relationship with debt financiers including non-equity, third party lenders. Andrews and his HEP partners performed many functions at ILG that would ordinarily be considered the responsibilities of officers and directors, including the organizational, strategic and consulting work Andrews described. JA 2266:3-2271:8.

In the fall of 2006, after less than two years under HEP's leadership, ILG was in material default of its loans with ILG's senior lender Bank of America ("BA"). BA demanded that ILG repay all its debt.  JA 2300:3-2302:17.  Andrews personally decided ILG would not pursue bankruptcy because bankruptcy was too expensive.  JA 1534:18-1535:24; JA 1470, ¶3.  Most of ILG's suppliers refused to supply ILG, and instigated collections lawsuits for nonpayment.  JA 528-581. Despite not paying many suppliers during this timeframe, ILG made sure that USAT continuously received payments, although sometimes late. Capital Source Bank ("CapSource") was a junior lender to BA, and CapSource bought BA's senior lien position.  JA 2301:4-2303:24. ILG's yearly revenues for 2006 were $171,936,578.00.  JA 1587, 1626, 2403:4-2406:18.  CapSource purchased BA's senior debt and required that Andrews put in more equity capital.  JA 2303:15-

10

24.  At that time, ILG employed more than 1,000 employees. JA 2319:11-14.

In 2006, HEP appointed Kennedy to be ILG's CEO.  JA 2316:14-2319:10.  Andrews contacted Ellis's former President Russ Reighley ("Reighley") to come back to work and attempt to rescue ILG's business.  JA 439-440, ¶¶14-17. ILG's survival required improving "supplier relationships" and strategic, vertical integration with critical suppliers ILG referred to as "partners".  JA 2353:16-2356:1; JA 440-441, ¶¶ 17-26.  ILG moved the vast majority of its production capacity offshore.  JA 2356:5-18.  Retaining the Wal-Mart business was particularly challenging because of Wal-Mart's "forecasting, demand planning and inventory management" oftentimes resulted in product shortages and emergency ordering.  JA 2362:2-2363:24.  Under Reighley and Andrews's supervision, ILG spent the majority of 2006 and 2007 trying to survive by working more closely with certain ILG suppliers.  JA 2364:5-2365:6. Andrews supervised ILG's strategy to reduce its volumes by $30 to $50 million to focus only on profitable business.  JA 2360:1-2361:15.  The Partnership Programs were profitable.

ILG's survival strategy required greater integration with USAT. JA 440, ¶17.  Reighley asked Jaime to work more closely with ILG, and to help ILG develop additional Mexican manufacturing capacity. JA 440-441, ¶¶18-23. To that end,

11

Reighley asked Jaime to meet with ILG's owners in February 2007. JA 443, ¶¶38-40.  Jaime met with Reighley, Kennedy and Passarello at HEP's offices in Virginia. JA 591-592, ¶¶2-7. Kennedy and Passarello told Jaime Balas that they, along with Andrews, were owners of ILG and were authorized to speak on Andrews's behalf.  JA 2786 also see JA 591, ¶3.  To entice Jaime to further integrate with ILG, Kennedy and Passarello told Jaime that "they and Andrews guaranteed ILG's debts…" Id. At ¶5; JA 596:4-12.  Kennedy and Passarello assured Jaime that Wal-Mart and Payless were "large customers" who were capable of paying their bills in a timely manner. Jaime Balas interpreted this statement to mean that payments from Wal-Mart and Payless "would always be made" JA 592, ¶6.  USAT relied on Andrews' personal guarantee to pay ILG's debts when USAT continued the strategic partnership with ILG, and when USAT agreed to further integrate with ILG. JA 234, ¶6; JA 159, ¶11; and JA 592, ¶6.

That integration plan included moving ILG's production capacity for trouser socks to Mexico and the Balas family managing all production for the "Partnership Programs". Andrews approved ILG "bailing" its production equipment to the Balas family and the Balas family operated a manufacturing plant for ILG in Mexico. JA 234-235, ¶¶10-13; JA 582-588; and JA 2375:10-2378:9.  The Balas family "seller financed" the production facility to ILG and managed ILG's operations. JA 2368:10-2374:2;

12

JA 591-592, ¶¶'s 4 and 7.  Reighley supervised this further integration including setting up a direct phone line as if USAT was internal to ILG's operations.  JA 238, ¶(vi), JA 441, ¶21.

From 2007 through 2011, the Balas family worked closely with ILG's management constantly evaluating and improving the Partnership Programs in order that both companies could make more money.  By 2011, ILG and USAT were integrated in a manner that made them appear to be one unified business to supply the Partnership Programs.  USAT dedicated more than 90% of USAT's capacity to ILG's needs for the Partnership Programs.  JA 160, ¶20. USAT worked with ILG to carefully plan production over the course of each year to spread production costs over time.  The strategic partnership for the Partnership Programs was critical to ILG's business, and the income generated by the strategic partnership was critical to paying ILG's creditors. To that end, USAT advised ILG regarding logistics to improve cash-flow and profits. JA 208, ¶21-22; JA 225-226; and JA 239, ¶(ix)  By May 2011, the strategic partnership included USAT consigning finished goods to ILG.  JA 236, ¶26(viii); JA 244-249.  USAT even took back goods and "re-worked" the goods to meet Wal-Mart needs.  JA 207-208, ¶¶19-20.  The relationship was described as a "vertically integrated" strategic partnership.  JA 440, ¶19; JA 442-444, ¶¶33-35, 40, 44.

From when CapSource became ILG's only lender, Andrews was aware that "but for" cash flow provided from CapSource, ILG would have failed. Accordingly, Andrews and ILG were required to provide extensive financial information on a regular (bi-weekly) basis to CapSource.  From 2006 when CapSource became ILG's only lender, ILG's revenues declined from $171,936,578.00 in 2006 to less than $33,000,000.00 year end 2010. JA 1638, 2415:4-2418:18. In the summer of 2010, Andrews courted James A. Williams ("Williams") to become ILG's President and CEO, and to "turn-around" ILGs business.  Williams relied on Andrews to manage the financial aspects of ILG.  JA ECF 1998:22-2000:19; JA 2096:1-2098:16.  In early September 2010, ILG "reorganized" by wiping out all shareholder equity.  Andrews signed "Waiver and Fourth Amendment to Loan and Security Agreement" including ILG and CapSource ("Loan Agreement"). JA 357. The Loan Agreement set forth the lien held by USAT's owners. JA 353.  The Loan Agreement further represented that the Wal-Mart "George" program (manufactured by USAT) was material to ILG's business. JA 356. ILG did not meet its own projections or CapSource's expectations and lost $3.2 million in 2010.  JA 2502:6-20.

At the end of 2010, Andrews hired Sanchez to be ILG's CFO. JA 2504:16-2505:11.  By the end of 2010, ILG's projections to CapSource for 2011 showed that ILG was in default of "forebearance covenants" and would need additional cash flow (by

14

increasing debt) of by $2.7 million to survive 2011. JA 2497:11-
2502:20.  Williams certified that ILG was in default of
"forebearance covenants" on February 15, 2011. JA 769-776.
Knowing that ILG was in default, Andrews was responsible for
discussing CapSource's intentions and responding as necessary.

During this same timeframe, in the end of 2010 and during
the first several months of 2011, USAT was working on production
and labor scheduling with ILG based on the expected Partnership
Program volumes for Fall 2011.  JA 213. USAT established the
2011 production based on information received from ILG.  Id.
USAT designed the products and prepared the in-store marketing
plans.  JA 206, ¶14, JA 215-217.

On March 3, 2011, CapSource told Andrews "[W]e have
reviewed your letter of March 2, 2011 and must respectfully
disagree with many of the statements and assertions made by
you….your unwillingness to consider alternatives is in conflict
with your responsibilities to CapitalSource and the other
creditors of International Legwear Group, Inc."  JA 784. At that
point, Andrews knew CapSource intended to stop funding ILG.  ILG
had failed and was failing its (1) leverage ratio; (2) adjusted
EBITDA; and (3) fixed charge coverage covenants by April 2, 2011
at the latest.  JA 2529:6-2530:20.  Neither Andrews nor any
other ILG Officer notified USAT of ILG's predicament; rather,

15

ILG continued to work with USAT and order trouser socks for the
Fall 2011 as if there were no problems.

In May 2011, although ILG supposedly owed CapSource
"approximately $36 Million", Andrews started looking for $6.5
Million to "buy-out" CapSource. JA 1108, p 5 ¶ 4, JA 2524:20-
2526:1.  Andrews was responsible for finding alternative lenders
for ILG. JA 2020:12-2021:21.  There is no evidence that ILG did
anything to seek alternative until Andrews attempted to "buy
out" CapSource's debt for such around $6 million. JA 2113:9-
2114:16. Andrews was the person responsible commenting on ILG
Senior Management for negotiating the new debt financing or sale
of ILG to a related party in June 2011. JA 422-423.   Andrews
communicated directly with CapSource and was responsible for
ILG's negotiations with CapSource. JA 425, 427-428.  After
CapSource refused to continue to fund ILG, Andrews attempted to
sell ILG's business to a related party.  JA 425.

From the beginning of May, Andrews was aware that
disclosing ILG's financial condition to USAT may result in USAT
stopping supply to ILG.  JA 2074:12-2075:10.  Andrews knew that
USAT was ILG's strategic partner, was critical to the Wal-Mart
George program and ILG must maintain that relationship if he
could find new financing or sell the business. JA 427-428.  For
the months of May and June, Andrews closely coordinated ILG's
cash-flow and payment promises with Sanchez.  In early June

16

2011, Sanchez went to Mexico City and met with Jaime, Juan and Salomon Balas, the officers of USAT. JA 2719. Jaime told Sanchez that USAT required consistent and constant payments to ensure that it could continue supplying products to ILG. JA 2720. Sanchez assured Jaime Balas that "it would be no problem to pay ILG [sic] $100,000 of the money owed by Wednesday, June 1, 2011" and that "ILG could make payments of at least $100,000 per week plus amounts for products being shipped according to production schedules until the account was current. JA 2720.

In an email to Andrews and Kennedy dated June 15, 2011, Sanchez notified Andres that ILG could not pay USAT. Sanchez outlined two "cash flow models" though the end of July 2011. Sanchez stated that the "best case" model provided for the availability of only $100,000 (total) to pay to all creditors. Sanchez stated that this model would allow ILG "to get to the week of July 23rd but will jeopardize our vendor relationships and potential receipts of product." JA 2722.  The other model provided for weekly minimum payments of $100,000 to USAT and another vendor.  Sanchez estimated that this model would have ILG "struggling to get through next week and completely under water the following week." Id. Sanchez further acknowledged that CapSource "will not continue funding in a negative situation and I fear that if our cash availability continues to be positive, [CapSource] will increase the reserves in order to force action

17

on our part." Id.  Despite Sanchez's dire cash flow projections
to Andrews, Sanchez wrote to USAT during this time to assure it
that ILG had "4 interested banks" and that ILG "will be
selecting one this week to move forward with.  That process will
take 4-6 weeks." Id.  On June 23, 2011, Sanchez notified USAT
for the first time that no payments could be made to vendors and
USAT stopped further production for ILG.  JA 2723.

After June 23, 2011, USAT repeatedly contacted ILG seeking
information regarding when payments would be made without any
meaningful response. JA 190-199. After ILG was not capable of
finding a lender to "buy out" Capital Source, and Andrews
attempted to sell ILG's business to a related party.  JA 425. As
late as July 7, 2011, rather than disclose ILG's condition,
Andrews was attempting for either a "newly created company" or
FourStar Brands (both associated with Andrews) to take over
ILG's business.  JA 425. On July 9, 2011 Andrews represented
that USAT was ILG's strategic partner in Mexico and was critical
to the Wal-Mart George program.  JA 427-428.  On July 18, 2011,
one of ILG's employees called USAT, told USAT that ILG's bank
was no longer willing to support ILG's equity owners and would
not give the equity owners additional time, and said ILG would
likely "file bankruptcy".  JA 230. On July 20, 2011, Andrews
received a list of ILG's "fiduciary expenses" from Sanchez

18

notifying Andrews of expenses ILG must pay to shut down in August 2011.  JA 985-986.

On behalf of himself, HEP and ILG's "investors", on or about July 20, 2011, Passarello and Andrews negotiated a deal to cause the sale of ILG's assets (and payment of non-fiduciary benefits for Andrews' benefit) after Andrews resigned from ILG. JA 430.  Pursuant to Andrew's plan, Williams remained ILG's only officer and director.  Williams signed all the documents executing the sale of ILG's business including the $655,256.16 of socks consigned to ILG for the Fall 2011 Partnership Programs. JA 852-874.

As a result of the deal struck by Andrews, ILG paid for among other things, for director and officer liability insurance on August 31, 2011 as well as HEP's attorney fees. JA 432-434. Andrews received notice after the lawsuit was filed that the D&O insurance was paying for defense of this lawsuit and other impermissible items were paid in September 2011. JA 432-435.  As set forth in the next section, Williams stayed on as ILG's President and CEO, but refused to provide discovery responses, allowed default be entered against ILG, and did not follow any process to notify creditors or resolve ILG's debts.

**B. Relevant Procedural Facts.**

Plaintiff filed the Verified Complaint in Catawba County, North Carolina on September 6, 2011 alleging  ILG, Andrews,

19

Sheely and Sanchez were jointly and severally liable for eight (8) claims for relief, including: (1) breach of contract; (2) breach of fiduciary duty/constructive trust; (3) fraud/fraudulent concealment/negligent misrepresentation; (4) unfair and deceptive trade practices; (5) fraudulent and/or negligent failure to perform statutory duties; (6) conversion and (7) fraudulent conveyance. JA 23-35. The damages sought were for $655,256.16 in Partnership Program trouser socks shipped in May and June 2011, and consequential damages relating to continued production, as well as interest thereon. JA 28, ¶¶76-78; JA 30, ¶¶99-103; JA 43-44. Defense Counsel appeared as Counsel for ALL Defendants on or about September 21, 2011. All Defendants filed joint 12(b)(6) Motion as to two claims for relief on October 10, 2011. JA 53-63. On October 14, 2011, Plaintiff filed a "Motion for Immediate Discovery, Discovery Responses and Answer to Complaint", which Motion was granted and required discovery responses on December 24, 2011 and answers to the Complaint by November 23, 2011. JA 64-65. All four (4) defendants submitted separate Answers on November 23, 2011. The parties had the Rules 16 and 26(f) initial conference, and submitted a "joint report" on December 20, 2011. Defendant ILG provided inadequate responses to Plaintiff's Document Production

Requests on December 23, 2011, and did not provide any documents[1].

On December 28, 2011, ILG's counsel filed Motion to Withdraw only as to ILG, citing a letter signed by Williams (ILG's then existing Chief Executive Officer) consenting to the withdrawal. JA 66-69. On December 30, 2011, all Defendants (including ILG) served the Rule 26 initial disclosures which were virtually identical, including reference to director and officer insurance coverage. JA 108-114; 123-129. On January 11, 2012, USAT objected to Defense Counsel withdrawing, citing among other reasons, that withdrawal appeared to be a litigation tactic to avoid discovery from ILG. JA 93-94. Further, USAT notified the Court that ILG's sophisticated corporate executives (including Andrews) were trying to make it appear like ILG was a "judgment proof debtor", when the liability issues were substantially identical for both the individual and the corporate defendant. JA 70-94. The Court granted the motion to withdraw ONLY as to ILG on January 11, 2012. USAT noticed ILG for 30(b)(6) Deposition for January 24, 2012 and no one showed. ILG did not retain substitute counsel and the Court entered

---

[1]  ILG's Rule 26(a)(1) Initial Disclosures revealed the existence of an Asset Purchase Agreement (APA") pursuant to which ILG apparently liquidated its assets to Richelieu Group.  The APA was not provided by ILG.  Based on JA 103-106, ILG and the Individual Defendants claimed not to have a copy and suggest a copy be obtained by Richelieu.

Default against ILG on February 2, 2012.  USAT noticed a Second

30(b)(6) deposition for May 3, 2012 and no one showed.

On or about April 3, 2012, Andrews produced 625 pages of

documents responding to USAT's request made on September 15,

2011.  On July 6, 2012, Andrews produced an additional 2,643

pages of documents. The discovery deadline was August 1, 2012.

In part based on Andrews's late discovery of 2,643 pages on July

6, 2012, as well as Williams repeated failures to show for

30(b)(6) depositions, USAT moved to extend the discovery

deadline on July 13, 2012 and renewed its motion to compel

against ILG. JA 2712. On July 13, 2012, individual Defendants

moved for leave to take the deposition of a third-party witness,

Russell Reighley, after the deadline for the completion of fact

discovery.  JA 2712.  On July 19, 2012, Judge Howell granted the

Defendants' request to take Mr. Reighley's deposition after the

close of discovery but denied Plaintiff's request for an

extension of time to complete discovery. JA 2712.  Plaintiff

objected to that Order. JA 2712.  Prior to the discovery

deadline, Plaintiff filed a motion seeking leave to take the

depositions of Williams (ILG's CEO and President) and Andrews

after the close of discovery.  JA 2713.  The Magistrate Judge

denied the Plaintiff's motion. Id. USAT objected to Magistrate

Judge Howell's denying motions to compel, refusing to extend the

discovery deadline and denying depositions of Williams and

Andrews. On July 31, 2012, Andrews produced an additional 865 pages of documents.

On September 4 2012, USAT moved for Summary Judgment against ILG seeking $2,123,000.00 in compensatory damages ("ILG Summary Judgment Motion"). JA 151-236; JA 496-703. USAT submitted the Affidavit of Jaime Balas (JA 157-203), Affidavit of Salomon Balas (JA 204-231) and Affidavit of Juan Balas (JA 232-249). USAT moved for Summary Judgment against Andrews and ILG's two officers. JA 250-495. Andrews and the two officers each moved for Summary Judgment on all claims. On September 5, 2012, Judge Howell entered an Order denying Plaintiff's renewed motion to compel against ILG, stating the Court "is not going to compel a party in default to respond to discovery. Rather, the proper course of action for Plaintiff to pursue is the filing of a motion for the entry of default judgment." Plaintiff also appealed that ruling by the Magistrate Judge. JA 2713

On September 24, 2012, the Court denied USAT's Motion for Summary Judgment against ILG, and directed that Plaintiff pursue Default Judgment against ILG. JA 1442-1444.

The Court held a hearing on October 24, 2012. As a result of that hearing, the Court granted the Plaintiff leave to take the depositions of Williams and Andrews and to seek non-party document production from ILG, Williams, and/or Richelieu Ltd. JA 1594-1597, JA 2714. ILG did not provide any responsive

23

documents. In Andrews's deposition, he stated "I don't know" more than 30 times and "I'd have to look" more than 80 times. JA 1832-1834. Andrews admitted that ILG would have the records which he would look at to answer the questions. JA 2290:2-2292:6. The parties were given the opportunity to file supplemental briefs of seven (7) pages following this discovery, and the summary judgment portion of the hearing was continued to November 21, 2012. JA 1594-1597. The parties filed their supplemental briefs on November 14, 2012. JA 1598-1854; JA 1855-2572 On November 21, 2012 the Court heard arguments from the parties on the summary judgment motions.

The Court granted Summary Judgment as to all claims against Defendant Andrews (in Andrew's favor), but denied Summary Judgment as to Fraud and Unfair Trade Practice claims against ILG's officers Sanchez and Sheely. JA 2709-2741. Prior to trial, ILG's officers Sanchez and Sheely made Offer of Judgment pursuant to Rule 68 to Plaintiff, and Plaintiff accepted the Offer of Judgment. The Offer of Judgment as to ILG's two officer defendants was entered. The Director & Officer Liability Insurer paid the Judgment entered against the two officers.

Plaintiff filed Motion for Default Judgment against ILG on January 22, 2013. JA 2749-2779. On March 25, 2014, the District Court entered Order finding "on the undisputed evidence before

24

the Court", from 2006 to 2011, International Legwear Group, Inc.
("ILG") "was continually in cash flow crisis and experienced
several and repeated defaults on its payments obligations under
certain credit and loan agreements that it has with its primary
lender ("CapSource")". JA 2787. The District Court entered
Default Judgment for "claims against International Legwear
Group, Inc." and awarded Six Hundred and Fifty-Five Thousand,
Two Hundred and Fifty-Six Dollars and Sixteen cents
($655,256.16)…which damages are trebled pursuant to §75-16"
and awarded $27,858.00 in attorney fees and Two Hundred and Thirty
Dollars ($230.00) in costs. The Court erroneously did not
include interest on the damages. The Court entered Judgment
against ILG on March 25, 2014 for a total of $1,993,856.48. JA
2781-2814.  Plaintiff now appeals the District Court's summary
judgment decision that Andrews was not liable for Plaintiff's
damages or interest thereon.

### SUMMARY OF ARGUMENT

The court erred by granting Summary Judgment in Andrews
favor and failing to grant Summary Judgment in USAT's favor.
The evidence in the record establishes that USA Trouser is
entitled to relief for Andrews' breaches of fiduciary duty and
constructive fraud, fraud/fraudulent concealment/negligent
misrepresentation, failure to perform statutory wind-up duties,
and unfair and deceptive trade practices in violation of

N.C.G.S. §75-1 et seq. USAT is entitled to $2,123,000.00
relating to the $655,256.16 socks manufactured and shipped in
May and June 2011, as well as consequential damages including
increased labor, raw material and packaging costs caused by
Andrews failure to ensure ILG disclosed its insolvent condition
to USAT.  Further, Andrews is liable for the interest on the
damages, which until December 2, 2014 amounts to $179,522.23 and
accumulating daily interest of $143.62.

### ARGUMENT

### I.    STANDARD OF REVIEW.

Summary judgment shall be awarded "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, show there is no genuine issue as
to any material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c).  A genuine
issue of fact exists if a reasonable jury considering the
evidence could return a verdict for the nonmoving party. *Shaw v.
Stroud,* 13 F.3d 791, 798 (4th Cir.1994), *certiorari denied* 513
U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994), *citing Anderson
v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510,
91 L.Ed.2d 202 (1986).  The party seeking summary judgment bears
an initial burden of demonstrating the absence of a genuine
issue of material fact. *Bouchat v. Baltimore Ravens Football
Club, Inc.,* 346 F.3d 514 (4th Circuit 2003). If this showing is

made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. *Id.* JA 2715 In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 556 (4th Cir. 2011). Where both parties seek summary judgment, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). JA 2716.

Consideration of the Default Judgment against ILG and evidence relating to ILG may also be instructive because this Court directed USAT could only pursue Default Judgment, and such findings would be binding on Andrews due to Andrews being a party in privity with ILG. Upon the entry of default, the defaulted party is deemed to have admitted all well-pleaded allegations of fact contained in the complaint. *J&J Sports Productions, Inc. v. Romenski*, 845 F.Supp 703 (W.D.N.C. 2012). The well-pleaded allegations of facts and liability of the amended Complaint are taken as true upon the entry of default. Fed.R.Civ.P. 8(b)(6); *Ryan v. Homecomings Fin. Network,* 253 F.3d 778, 780–81 (4th Cir.2001). The Court may rely on affidavits or

27

documentary evidence in the record to determine the appropriate sum of damages. *EEOC v. North Am. Land Corp.,* No. 1:08-cv-501, 2010 WL 2723727, (W.D.N.C. Jul. 8, 2010).

## II. DISCUSSION OF ISSUES.

### A. THE TRIAL COURT ERRED BY FAILING TO GRANT USAT'S SUMMARY JUDGMENT THAT ANDREWS OWED USAT FIDUCIARY DUTIES AND BREACHED THOSE FIDUCIARY DUTIES THEREBY COMMITING CONSTRUCTIVE FRAUD.

Andrews owed fiduciary duties to USAT arising out of (1) ILG's strategic business partnership for the Partnership Programs; and (2) arising from Andrews being Chairman of ILG's directors during ILG's insolvency.  Andrews' failure to disclose ILG's financial condition to USAT breached those duties thereby causing unique damages proven by USAT.

#### 1. Andrews Owed Fiduciary Duties to USAT Arising Out of ILG's Relationship With ILG As Well As Andrews Commitments By And Through HEP Which Caused USAT To Become Dependent on ILG for the Wal-Mart and Payless Partnership Programs.

North Carolina broadly defines fiduciary relationship as one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence ..., [and] it extends to *any possible case* in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other.*" See *Dalton v. Camp,* 353 N.C. 647,651,

28

548 S.E.2d 704, 707-708 (2001). Generally, the existence of such a relationship is determined by specific facts and circumstances, and is thus a question of fact for the jury. *Stamm v. Salomon*, 144 N.C.App. 672, 680, 551 S.E.2d 152, 158. Business partners, however, "are each others' fiduciaries as a matter of law." *HAJMM Co*. v. House of Raeford, 94 N.C.App. 1, 403 S.E.2d at 489(citing *Casey v. Grantham*, 239 N.C. 121, 79 S.E.2d 735 (1954)).

"Whether a fiduciary relationship exists is determined by the specific facts and circumstances of the case [and] [g]enerally 'the existence or nonexistence of a fiduciary duty [is] a question of *fact* for the jury.'" *Mikels v. Unique Tool & Manufacturing Co., Inc*., 2007 WL 4284727 (W.D.N.C. 2007), citing to *HAJMM Co. v. House of Raeford Farms, Inc*., 94 N.C.App. 1, 13, 379 S.E.2d 868, 875 (1989). A fiduciary has a duty to disclose all facts material to transactions.  *Stamm v. Salomon*, supra at 680-61, 158 (2001). "Where a relation of trust and confidence exists between the parties, 'there is a duty to disclose all material facts, and failure to do so constitutes fraud.'" *Vail* v. Vail, 233 N.C. 109, 114, 63 S.E.2d 202, 205-206 (1951) 114, 63 S.E.2d at 205-206 (quoting 37 C.J.S., Fraud, s 16, p. 247). Plaintiff must show facts and circumstances (1) which created a relationship of trust and confidence, and (2) which led up to and surrounded a transaction in which defendant allegedly took

29

advantage of his position of trust to injure the plaintiff. *Watts v. Cumberland County Hosp. System, Inc.*, 317 N.C. 110, 116, 343 S.E.2d 879, 880 (1986). "When a fiduciary relation exists between parties to a transaction, equity raises a presumption of fraud when the superior party obtains a possible benefit." *Id.*

Substantial unrefuted evidence in the record establishes that Andrews had direct duties to disclose ILG's business conditions to USAT in a timely manner. Relying on *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, the District Court failed to recognize unrefuted facts that the relationship between USAT and ILG was much more than an interdependent supply relationship, and that USAT suffered compensable damages unique to USAT's fiduciary relationship with ILG. In *Tin Originals, Inc.*, the evidence was limited to an "exclusive distributorship" relationship. *Tin Originals, Inc.* stated that interdependency **alone** does not create fiduciary duties. The holdings in *Tin Originals* do not accurately capture the relationship and circumstances alleged in this case. "The parties as manufacturer and promoter/seller do not prevent the relationship from being properly described as fiduciary; nor does the fact that this relationship, like all business relationships, involves economic risks and the impact of changing business circumstances.... [W]hich party is in a superior position is a matter of evidence

30

and not *a priori* category." 367. ILG's relationship was more than commercial interdependency, but was a "vertically integrated strategic partnership" built over more than nine years which vertically integrated Plaintiff's manufacturing with ILG's sales and marketing to exclusively supply Wal-Mart and Payless trouser socks. JA 157, ¶2; JA 205, ¶8; JA 233, ¶2; JA 234, ¶¶9-11. ILG's former CEO testified the relationship was a special relationship built on trust and confidence developed over years of experience. JA 440, ¶¶19-20. In addition to being interdependent, USAT was completely dependent on ILG for 90% of USAT's revenues. ILG maintained the customer relationships, had consigned inventory and was responsible for collecting payments. USAT relied on ILG to be USAT's "sales force" and interface with Wal-Mart and Payless for customer service. JA 160-161, ¶¶23-25. USAT relied on ILG to collect payments, and ILG's owners guarantee of payment. Production schedules and staffing levels where established pursuant to a "lineal" production formula developed through working together that spread the costs of production over the full year thereby improving profits for both ILG and USAT. JA 512, JA 1084:20-1086:3. USAT's raw material pricing and payment terms were based on Partnership Program volume commitments. JA 161 ¶26. Further, the relationship included facts supporting greater than ordinary trust, including: (i) bailment of equipment (JA 234, ¶¶9-11); (ii) the

31

Balas family seller financed the property to ILG; (iii) USAT
started and operating ILG's Mexican operations and paid ILG's
employees (JA 619-624); (iv) joint production and staffing
planning (JA 234, ¶¶9-11); (v) consignment of goods by USAT to
ILG; (vi) sharing of confidential information; and (vii)
personal guarantees from ILG's owners to USAT. USAT intended
that Wal-Mart and Payless payments be held for the benefit of
USAT and ILG.  JA 159, ¶¶11-12; JA 207, ¶15. HEP partners
reaffirmed that understanding in 2007. In 2011, Sanchez
reiterated Wal-Mart and Payless payments would ensure payments
to Plaintiff. JA 164, ¶47. Payments to the Balas families were
part of ILG's loan covenant calculations. JA 1295-1308.  The
relationship was so close, that the Balas considered ILG like
family. Under similar circumstances, North Carolina's Supreme
Court recognizes that Company directors and officers can be held
liable for failing to earmark corporate funds for payment to
intended third party beneficiaries. *Snyder v. Freeman,* 300 N.C.
204, 266 S.E. 2d 593 (1980). JA 1269-1270. Former ILG CEO
Reighley testified that the relationship with USAT and the Balas
family was much more than an ordinary commercial relationship.
JA 440-441, ¶¶20-35, 40.  The relationship began in 2000 prior
to ILG's formation, and was critical to Andrews decision to
purchase ILG.  From the time that Andrews decided ILG should
purchase of Ellis Hosiery, Andrews knew that the Balas Family

32

had a special relationship with ILG. JA 439-443, ¶¶12-40. The
Partnership Programs were only possible due to USAT's
integrating its operations with ILG's customer-facing
management. JA 442, ¶ 35. USAT was involved in virtually all
aspects of the Partnership Programs. JA 443, ¶ 40. There was a
direct "planning link-up…in which ILG's production planners
interfaced with Giovanni's manufacturing group." JA 441, ¶23.
ILG had an internal telephone extension to Plaintiff's
operations. JA 441 at ¶ 24. USAT's labor force was relied on
ILG supplying Wal-Mart special needs information. JA 441-442,
¶¶ 25, 32. Historically, ILG paid USAT for excess labor costs
resulting from production shut-downs and rehiring relating to
ILG's poor performance and payment delays. JA 1471-1472, ¶¶ 10-
11.

    In 2006, when no other suppliers would supply ILG, ILG
appealed to historic loyalty of the Balas family. JA 440, ¶¶17-
20; JA 1471-1472, ¶¶10, 11, 14. Andrews authorized shipping
ILG's assets and equipment to Mexico under a "bailment contract"
with Jaime Balas. JA 441-443, ¶¶28-30, 37-39. HEP's personal
guarantees to pay ILG induced Jaime to further "integrate"
operations with ILG in late 2006. JA 234, ¶5; JA 442-443, ¶¶36-
39. Because ILG and Plaintiff were "business partners" with
regard to the Wal-Mart and Payless business, ILG had duties to
hold the socks and proceeds therefrom in trust for the benefit

of ILG and Plaintiff. See JA 520. The Wal-Mart and Payless
business sold exclusively through ILG accounted for
approximately 90% of Plaintiff's business.  JA 25, ¶24-28; JA
160, ¶20.  Due to the relationship between USAT and ILG, there
were no lawyers or a "written contract" for all terms. JA
1034:17-1035:19. The relationship was akin to joint venture
which USAT characterized as similar to "brothers and sisters".
JA 1031:12-1036:20.  ILG was entrusted with consigned
inventories of socks. JA 159, ¶¶10-12.

The District Court's failure to recognize unrefuted facts
making up the ILG-USAT relationship was in error.  Andrews knew
of the facts creating fiduciary relationship with USAT and in
good conscience was required to disclose ILG's condition to
USAT. Andrews's HEP partners regularly convinced USAT and others
to work with ILG by assuring USAT HEP partners would make sure
ILG paid.  JA 1471, ¶4; JA 1473, ¶18.  In May and June 2011, ILG
ordered and received $655,256.16 in socks for the Fall 2011
"back to school" sales.  ILG's continued possession of those
socks gave ILG all the proverbial cards for the imminent Fall
2011 Partnership Program Sales. Rather than disclose ILG's
financial condition to USAT, Andrews worked with Sanchez
intending to avoid disclosures to USAT, in order that Andrews
operate ILG or purchase ILG for his personal benefit. Andrews
did not tell USAT that Andrews was trying to sell ILG, because

34

the Partnership Program was the biggest part of the value
Andrews could and did sell. Andrews was able to obtain releases
from CapSource and payment of insurance because of the value of
the Fall 2011 Partnership Program inventory.

### 2. The Trial Court Erred by Failing To Recognize At the Summary Judgment Stage that ILG was Insolvent and During Insolvency Andrews Fiduciary Duties Flowed Directly to USAT.

There is no dispute that at all times Andrews owed duties
to ILG's stockholders to disclose ILG's insolvent condition.
Those duties shifted to USAT when ILG was insolvent. A company's
directors owe fiduciary duties to the company creditors when the
business is insolvent. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct.
238, 84 L.Ed. 281 (1939) (finding that a series of transactions…
fraudulent where they had the effect of depriving one of the
corporation's creditors of access to the corporation's assets to
satisfy debts owed.); *Fed. Deposit Ins. Corp. v. Sea Pines Co.,*
692 F.2d 973, 977 (4th Cir.1982); *In re U.S. Digital, Inc.* 443
B.R. 22 (Bankr.D.Del 2011) (finding spinning off valuable assets
violated duties to creditors even though it may have generated
money for the insolvent company's benefit). Virginia finds that
was a business enters the "zone of insolvency" then the officers
and director owe fiduciary duties directly to creditors. If the
directors and officers continue to operate an insolvent
corporation in order to benefit themselves to the detriment of

35

the corporation's other creditors, North Carolina equates that to a winding up. *Mitchell v. The Erin Mills Capital Corp. (In re Maxx Race Cards, Inc.),* 266 B.R. 74, 78 (Bankr.W.D.N.C.1998).

ILG's liabilities are imputed to the Individual Defendants under the "corporate trustee" doctrine. Like Virginia[2], "North Carolina adheres to the 'trust fund doctrine,' which means, in a sense, that the assets of a corporation are regarded as a trust fund, and the officers and directors occupy a fiduciary position in respect to stockholders and creditors, which charges them with the preservation and proper distribution of those assets." *Underwood v. Stafford*, 270 N.C. 700, 702, 155 S.E.2d 211, 212 (1967). "And directors are liable for the misapplication of funds held in trust by the corporation, where they knew or ought to have known thereof....Directors who mingle money collected for another with the funds of the corporation, in violation of the instruction of the owner, or who knowingly permit their subordinates to do so, whereby the fund is lost, are personally liable therefor." *Minnis v. Sharpe*, 198 N.C. 364, 367, 151 S.E. 735, 737 (1930). Where third persons are injured by a wrong done by the corporation, the corporation can act only by officers or agents; hence third persons should be entitled to recover from the officers or agents who are wrongdoers." Id. at 367, 737. JA 1267-1269.

36

As a sophisticated financier, Andrews knew that ILG was under-capitalized, failing and would not be able to survive. Undercapitalization or "thin incorporation" is a factor in establishing personal liability. *Glenn v. Wagner*, 313 N.C. 450, 455, 329 S.E. 2d 326, 330 (1985). If ILG was not under-capitalized from inception, Andrews was aware that ILG's consistent revenue drop from 2006 of $171,936,578.00 to less than $33,000,000.00 year end 2010. Such a decline obviously caused breaches "inventory based" financing covenants. JA 1599, 1638, 2415:4-2418:18. ILG operated under forebearance of enforcement at all times after April 2007. Andrews operated ILG for more than four years collecting $30,000.00 per month to enrich himself while hoping to sell ILG for a profit to benefit himself. JA 1262-1263. A reasonable fact-finder certainly could find that Andrews knew before March 2011, but in no case later than early March 2011 at the latest, that ILG was both cash-flow and balance sheet insolvent. A reasonable fact-finder could conclude that Andrews continued to operate ILG to enrich himself when Andrews knew ILG was both balance sheet and cash flow insolvent. Even in the face of positive testimony to the contrary, a jury could conclude Andrews committed fraud for years to enrich himself. *Hudgins v. Wasoner*, 204 N.C. App. 480, 486, 694 S.E.2d 436, 442 (2010).

---

[2] Also see JA 264-266, Section C.

Andrews was primarily responsible for the financial aspects
of ILG's business triggering direct duties to creditors, Andrews
was responsible for managing ILG's relationship with CapSource.
JA 1741-1743; JA 2014:1-2016:3. Andrews knew only withholding
key financial information from ILG's suppliers would permit ILG
to stay in business. Andrews demonstrated his intentions on
several occasions. For example, on May 20, 2009, Andrews was
aware tensions with CapSource were high, that CapSource and HEP
were discussing liquidation scenarios, and Andrews pushed to
intentionally withhold ILG's financial condition from a key
licensor. JA 2447-2454; JA 1723-1725.  The inference
legitimately deducible from these circumstances would be to
conclude that, at the latest, May 20, 2009, Andrews knew ILG was
both balance sheet and cash flow insolvent.  The business
continued to shrink thereafter, while Andrews HEP was charging
monthly fees of $30,000.00 per month.

Andrews was responsible for hiring ILG's officers and as
Chairman controlled ILG's officers.  From March 3, 2011, Andrews
knew ILG was in default and CapSource would not continue to fund
ILG. JA 769-771. Andrews knew ILG was losing money (JA 793-802)
and needed at least an additional $3,370,950.00 to survive 2011.
JA 786-788.  CapSource told Andrews he was breaching duties to
all ILG creditors. JA 783-784.  By May 5, 2011, Andrews knew ILG
was in a cash-burn position, ILG would need $1.2 Million in cash

from selling assets and "factoring" Partner Program receivables
if ILG would survive the quarter.  JA 2518:23-2527:20. Andrews
did not seek the $1.2 million in additional cash need, rather
Andrews sought a new lender attempting to "buy out" CapSource
for $6 to 6.5 million.

Andrews was solely responsible for CapSource terminating
its relationship with ILG and ILG's failing financial condition.
JA 2018:1-2022:4.  After CapSource notified Andrews it was
terminating the relationship, Andrews received cashflow
forecasts showing the business was worse than projected to
CapSource.  JA 2022:5-2025:22.  Rather than disclose ILG's
financial condition to USAT, Andrews pursued only options that
would benefit Andrews.  Andrews knew at that time ILG was
balance sheet and cash flow insolvent. By June 15, 2011 (at the
latest), Andrews knew CapSource would not continue funding ILG
and ILG did not have sufficient cash to survive the month. JA
826.

### 3. The Trial Court Erred by Failing to find Unrefuted Evidence Proved Andrews Breached the Fiduciary Duties to USAT.

The trial court articulated its own standard of law when
evaluating whether duties shift to creditors. The trial court
erred in finding "the directors and officers of ILG were
actively trying to secure financing for the continued operation
of ILG up until the point that CapSource decided to foreclose"

39

and "actively continuing ILG's operations" establishes that "a fiduciary duty simply did not arise." JA 2729-2730. Further, there is no evidence to support that Andrews or ILG ever looked for nor capable of finding sufficient financing to satisfy CapSource's then outstanding loans. The evidence suggests Andrews' personal decision-making caused CapSource to stop lending to ILG. On March 3, 2011, Cap Source told Andrews: "We have reviewed your letter of March 2, 2011 and must respectfully disagree with many of the statements and assertions made by you….your unwillingness to consider alternatives is in conflict with your responsibilities to CapitalSource and the other creditors of International Legwear Group, Inc." JA 783-784.

Further, contrary to the trial court's conclusion, the evidence tends to support that ILG did nothing for two months prior to May 2011 despite knowing of insolvency. Only on May 12, 2011 did Andrews start looking for lenders for "$6-$6.5 Million buyout" CapSource's debt. JA 804-812. ILG paid BizCap to prepare the Offering Memorandum and find potential lenders for $6 million. JA 805-822. The "Offering Memorandum" (hereinafter, "OM") the OM required Sheely's "Four Star" be included as part of the proposed loan transaction JA 822; and (iv) the OM requested only $6 Million. JA 422-423, also JA 1019-1106, 1111, 1131 and 1177. Sanchez states in June 2011, he was "actively involved in searching for financing solution to try to improve

40

the Company's situation." JA 1116 ¶13.  Sanchez states nothing more than he was "hopeful that ILG would come to an agreement with one of the many potential lenders". JA 1116 ¶14.

The two "initial responses" of the "many potential lenders" shows financing was not likely, ILG could not obtain financing to buy out CapSource, let alone survive the year.  Among other obstacles to Gemcap financing, Gemcap (i) required Four Star's participation; (ii) did not guarantee any particular amount; and (iii) required a first priority lien (ie- CapSource liens be bought out). *Id*.  Further, the Advisco Capital Corp. ("ACC") proposal required, among other terms: (i) guarantee by the Borrowers; (ii) subordination of all "loans and other amounts due to/from shareholders; (iii) restructure of the financial obligations to Capital Source, which would become subordinate to ACC; and (iv) a cash equity contribution in an amount not less than $2,000,000 by Harvest Equity Partners, LLC. JA 1145-1150. **Further,** there is no indication that ILG could obtain the $3,370,950 necessary for ILG to survive the year.  JA 785-787.

The Trial Court ignored evidence proving Andrews breached duties to unsecured creditors. The Trial Court ignored that from September 2010 until and including July 2011, ILG paid HEP $30,000 per month, which served as the basis for Andrews's personal compensation. The Trial Court found:

> "When a fiduciary duty arises,
> directors of a corporation may prefer
> secured creditors over unsecured creditors.
> 149 N.C. App. At 33, 560 S.E.2d at 827. It
> is undisputed that ILG had secured
> creditors, including CapSource, which were
> required to be paid before any unsecured
> creditors, such as USA Trouser…the proceeds
> of the sale of ILG's assets were paid to
> CapSource, and not to any of the Individual
> Defendants. This is uncontroverted." JA
> 2730.

There is no evidence in record that CapSource demanded

repayment of the entire secured debt or that CapSource forced a

"foreclosure". Further, the trial courts findings are

contradicted by the evidence in the record. The evidence in the

record establishes that CapSource was willing to accept

substantially less than the full secured loan amount to satisfy

the debt in full. ILG's Board Meeting minutes dates July 6,

2011 state:

> "Multiple sessions and calls have addressed
> the desire by equity holders to pursue the
> purchase of the Peds Brand, real estate and
> possible receivables and inventory. CS
> position is that an "orderly liquidation"
> may achieve higher proceeds. CS is looking
> for $7-7.5 million to go away." JA 1240.

ILG's own minutes also support that an "orderly sale" of ILG's

assets (such as contemplated by Bankruptcy or statute) would

have yielded greater value for ILG's assets. Further, these

minutes reflect the "insiders" intent to prefer themselves in a

sale of ILG's assets. Even if the District Court was correct,

42

the evidence is sufficient for USAT to prove at trial that any purported foreclosure by CapSource was "collusive" in violation of N.C.G.S. §39-23.3(b).  N.C.G.S.§39-23.3(b).

Further, there are many outcomes that the District Court did not consider in finding that secured liens protect Andrews. For example, had Andrews disclosed ILG's condition in a timely manner, USAT may have been able to require cash in advance or reclaim goods pursuant to the UCC. N.C.G.S.§25-2-702. Andrews decided to pursue "short-buy out" of CapSource for ILG rather than file bankruptcy prejudiced USAT's reclamation rights.

### B. THE TRIAL COURT FAILED TO FIND THAT ANDREWS BREACHED FIDUCIARY DUTIES OWING TO USAT.

Once a fiduciary relationship is established, North Carolina law presumes that Andrews committed constructive fraud. When the superior party obtains a possible benefit through the alleged abuse of the confidential or fiduciary relationship, the aggrieved party is entitled to a presumption that constructive fraud occurred. *See Forbis v. Neal*, 361 N.C. 519, 529, 649 S.E.2d 382, 388 (2007). This presumption arises "not so much because [the fiduciary] has committed a fraud, but [because] he may have done so." *Id.*  The "more skillful and cunning the accused, the less plainly defined are the badges which usually denote [fraud].  Under such conditions, the inferences legitimately deducible from all the surrounding circumstances

43

furnish….often in the teeth of positive testimony to the contrary, ample ground for concluding that fraud has been resorted to and practiced[]". *Hudgins v. Wagoner*, 204 N.C.App. 480, 486, 694 S.E.2d 436, 442 (2010). North Carolina recognizes a failure to distribute trust assets is evidence that Andrews sought to benefit himself. *Compton v. Kirby*, 157 N.C.App. 1, 577 S.E.2d 905 (2003).

    Damages incurred by USAT and sought in this litigation arise directly from failures to timely disclose ILG's financial condition and are unique to USAT. USAT's business model relied on ILG timely notifying USAT of changes that affected cashflow. JA 163 ¶44. Jaime reminded Sanchez of this fact on June 6, 2011 and again on June 22, 2011. JA 163-164 ¶¶44-50. ILG reassured USAT on June 6, 2011 that Wal-Mart and Payless payments would continue uninterrupted to pay for USAT's labor and raw materials. JA 164 ¶47. Historically, ILG compensated USAT for similar labor disruptions caused by slow payment. JA 1472, ¶11. ILG's failure to notify USAT of payment interruption caused USAT consequential damages including increased labor costs, termination costs and retraining costs of $175,000.00. JA 167 ¶¶65, 68(1). USAT incurred additional raw material and obsolete packaging costs of $163,000.00. JA 168, ¶¶68(2) & 68(3). Such damages are in addition to the Partnership Program socks for

which ILG did not pay. The total damages supported by unrefuted affidavit is $2,123,000.00. JA 169.

### C. ANDREWS TORTIOUSLY BENEFITTED FROM CONTINUED OPERATION OF ILG AND CAUSING ILG TO SELL ASSETS AT A FIRE SALE PRICE.

From September 2010 and thereafter, Andrews's HEP and Andrews received $30,000 monthly pursuant to a "management agreement", despite ILG having no shareholder equity. Andrews knew ILG projected insolvency in December 2010, yet continued to accept the monthly fee for six more months. After notice that CapSource would not lend, Andrews only pursued options that benefitted Andrews.

Further, in the waning days of ILG, it is clear that Andrews intended for "non-fiduciary" payments to be made to others (his lawyers as well as D&O Insurance) that benefitted from Andrews's position as an insider. JA 432-435. Accordingly, Andrews should be responsible for all damages caused because Andrews pursuit of self-dealing outcomes as well as all amounts paid for Andrews benefit. JA 437-444. Passarello, on behalf of HEP, negotiated releases of liability with regard to the officers, and CapSource has not asserted any claims. Obviously, that release had a value otherwise seeking such a release would have been unnecessary.

Further, the Individual Defendants are benefitting from payment by ILG for the Director & Officer liability insurance in

45

the sale of ILG's assets. JA 432-435.  There is no justifiable or legal reason that payment was made to continue the Director and Officer liability insurance except to benefit the former officers and directors of ILG.  The Director and Officer liability insurance provider is in a lower priority of creditor as Plaintiff.  However, the difference is that ILG's insiders knew that paying such premiums would give disproportionate benefit should their decision to "walkaway" be challenged. USAT did challenge that decision.  Andrews and the other Individual Defendants caused a preference payment to protect themselves and are using that protection to benefit themselves and to the detriment of Plaintiff.  The detriment of Plaintiff is even more egregious when that decision in violation of public policy permits defense costs of up to Three Million of the policy coverage. JA 446-490.  Further benefit to the Directors was the payment of attorney fees to ILG's lawyers to draft and negotiate the deal with CRG, CapSource and Gordon Brothers. *Id.*  Although some of the payment figures appear to have been redacted, it appears from S-Andrews-02-004134 paid $40,000.00 in ILG's outstanding legal fees. JA 432-435.  Defendant Andrews is a sophisticated corporate executive that violated public policy so that he could obtain an unfair advantage over Plaintiff when ILG was failing.

Directors of an insolvent corporation cannot…secure to themselves a preference.  They must share ratably in the distribution of the company's assets. See *Keener Lumber Company, Incorporated v. Pewy III*, 149 N.C. App. 19, 560 S.E.2d 817 (2002) ("directors, officers or shareholders are not allowed to take advantage of their intimate knowledge of the corporate affairs or their position of trust to the detriment of other creditors"). The *Keener Lumber* case is on-point with regard to similar circumstances as described in the Complaint numbered allegations 42 through 62. In *Keener Lumber*, the individual Defendants were found liable for constructive fraud even though bankruptcy protection was sought by the corporate defendant. See *Keener Lumber Company, Incorporated v. Pewy III*, 149 N.C. App. 19, 560 S.E.2d 817 (2002). Surely, if Andrews testimony was the same at trial, a Jury would reasonably conclude that Andrews "did know" or should've known answers to questions about ILG's finances. JA 2291-2292.  At trial, a jury would reasonably conclude Andrews's should have gone back and researched to the more than 80 questions Andrews said he could after he had opportunity to "go back and look". JA 1832-1834. Certain portions of Andrews's testimony would be something the jury could reasonably determine was not credible.  Without the seeing Mr. Andrews, the court improperly assumed Mr. Andrews's testimony was complete and credible.

47

**D. THE TRIAL COURT ERRED BY FAILING TO FIND ANDREWS BREACHED STATUTORY PROCEDURES TO ORDERLY WIND-UP, LIQUIDATE ASSETS, AND PAY DEBTS.**

The public policy and laws of North Carolina and Virginia proscribe several ways an insolvent and failing corporation can discharge debt, primarily: (1) Bankruptcy Protection or (2) Directors and Officers pursue statutory provisions to wind up the company.  It may be true that CapSource, would have been entitled to security interest in those circumstances, but the process would have been orderly and allowed USAT opportunity to recover.

From 2006 through the Spring of 2011, Andrews knew bankruptcy was an option for ILG.  ILG's books showed it had asset value of $22,335,264.00 in April 2011.  JA 805-813. Andrews admitted in deposition he elected not to pursue bankruptcy because it would be "too expensive" to ILG. Had Andrews either notified USAT or filed bankruptcy, pursuant to Bankruptcy Code Section 546(c), USAT would have 45 days to reach back and reclaim goods. *11 U.S.C.§ 546*. If that 45 day period is measured from June 13, 2011 (the day Sahchez informed Andrews ILG could not survive), USAT would have been able to reclaim all $655,256.16 that Andrews HEP caused ILG to sell to Richelieu. Had Andrews timely disclosed ILG's insolvency, USAT likely would not have incurred any damages. Or another alternative, USAT may have been in a position to "buy" ILG's business or at least the

48

Partnership Programs, and obtain ILG's portion of the profit. JA 166-167 ¶¶59-65. Andrews refusal to communicate with USAT prejudiced a potential more valuable, orderly sale of ILG's assets. Further, but for the immediate cash-flow crises caused by CapSource, if ILG was solvent, the Chapter 11 would have stayed collection and may have resulted in continued operation.

The District Court was presumptuous to conclude that CapSource would not have accepted that same $6 million in a bankruptcy proceeding, leaving more than $11 million in ILG's value for other creditors. The effect of a Chapter 11 proceeding could have resulted in USA Trouser owning ILG. Andrews decisions caused ILG's assets to be sold at a "fire sale" price. JA 1269:13-21. A more orderly sale likely would have resulted in at least $17 million and potentially closer to ILG's April 2011 asset value. As stated by ILG's former CEO Reighley, "[b]ased on my knowledge of Scott Andrews, Shannon Kennedy and Kevin Passarello, I am surprised that Scott Andrews, Keven Pasarello and Shannon Kennedy have not satisfied debt owed to the Balas family. I believe that each of them is smart enough and have enough business experience to know that unless there is some form of bankruptcy protection, there is liability to the Balas family." JA 1486, ¶22.

Although ILG was a Virginia Corporation, North Carolina's Corporations Act sets forth virtually the same procedures if a

49

corporation dissolves and attempts to wind-up its affairs as
Virginia.  North Carolina General Statute §55-14-03(c) states
for "the purposes of this Chapter, a dissolved corporation is a
corporation whose articles of dissolution have become effective
and includes a successor entity to which the remaining assets of
the corporation are transferred subject to its liabilities for
the purposes of a liquidation." *N.C.G.S. §55-14-03*.  If
Directors desire to dissolve a company and resolve liabilities,
they must follow the procedure, including advance notice
requirements, set forth in N.C.G.S §55-14-02.  *N.C.G.S. §55-14-
02*.  When a corporation desires to wind-up its affairs, it can
pursue dissolution, but it must make provisions for discharging
its liabilities.  *N.C.G.S. §55-14-05*. Dissolution of a
corporation does not prevent commencement of a proceeding
against the corporation.  The procedure for known claims against
the corporation, such as the circumstances before this court,
requires that the corporation notify known claimants and provide
the known claims to submit claim within 120 days of notice.
*N.C.G.S. §55-14-06*. Under Virginia Code §13.1-755, "[t]he
termination of corporate existence shall not take away or impair
any remedy available to or against the corporation, its
directors, officers or shareholders, for any right or claim
existing or any liability incurred, prior to such termination."
Virginia's statutory provision further provides that "[a]ny such

50

action . . . against the corporation may be prosecuted or defended by the corporation in its corporate name," and "[t]he shareholders, directors and officers shall have the power to take such corporate or other action as shall be appropriate to protect such remedy, right or claim." *Va. Code §13.1-755.* In addition, upon the involuntary termination of a corporation's existence, "the properties and affairs of the corporation shall pass automatically to its directors as trustees in liquidation." *Va. Code §13.1-753; see also Va. Code §13.1-752.*

Since 1920, North Carolina's Supreme Court has held that actions by officers, directors and stockholders of a company which seek to avoid liabilities by voluntary distribution of the capital and assets is considered attempted fraud. *Chatham v. Mecklenburg Realty Co.*, 180 N.C. 500, 105 S.E. 329 (1920). North Carolina's Corporations Act enforcement provisions make directors and shareholders liable regardless of whether distribution was made when the corporation was unable to meet its obligations and regardless of whether a party knew the distribution violated the Corporations Act. *See Commentary to N.C.G.S. S55-14-08(a)(2).* This record reveals that Andrews, acting as Chairman of ILG's Board did not attempt to follow North Carolina public policy and statutory procedures intended to cause orderly liquidation and resolution of liabilities. Rather, acting for ILG's related party creditors and

51

Shareholders (the "Investment Partnerships") as well as for himself, Andrews agreed to sell ILG's assets without notice to USAT as a creditor. JA 2099:24-2105:1. Andrews did so on or about July 20, 2011, more than forty days after Andrews knew ILG was unable to meet its obligations.  As part of that deal, Andrews had his lawyers paid, had a director and officers liability insurance policy benefitting him paid, and Andrews received substantial benefit in the form of attorney fees to defend claims (for the next three (3) plus years) against him from the Director and Officer liability insurance. These certainly were the actions of a cunning, crafty and experienced corporate executive attempting to avoid liability. See *Hudgins v. Wagoner*, supra; also see *Ragsdale v. Kennedy*, 286 N.C. 130, 209 S.E.2d 494 (1974). USAT should be permitted to introduce evidence to a jury that shows that Andrews received benefits (both direct and indirect), including a vigorous legal defense, which detrimented USAT.  *State ex rel. Howes v. W.R. Peele, Sr. Trust*, 876 F.Supp. 733 (1995).  Under such circumstances, a jury may award punitive damages as well as compensatory damages.

  **E. ANDREWS'S CONDUCT IN BLEEDING ILG FOR HIS OWN BENEFIT, BREACHING FUDICIARY DUTIES AND IGNORING PUBLIC POLICY REGARDING FAILING BUSINESSES AMOUNT TO UNFAIR AND DECEPTIVE TRADE PRACTICES.**

  Chapter 75 of the North Carolina General Statutes prohibits unfair acts which undermine ethical standards and good faith

between persons engaged in business dealings. *See McDonald v. Scarboro,* 91 N.C.App. 13, 18, 370 S.E.2d 680, 683, *disc. review denied,* 323 N.C. 476, 373 S.E.2d 864 (1988). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *See Marshall v. Miller,* 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). The concept of 'unfairness' is broader than and includes the concept of 'deception.'" *Overstreet v. Brookland, Inc.* 52 N.C.App. 444, 453, 279 S.E.2d 1, 7 (1981), quoting, *Johnson v. Phoenix Mut. Life Ins. Co.,* 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980); *See Mitchell v. Linville*, 148 N.C. App. 71, 557 S.E.2d 620 (2001); "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Dalton v. Camp,* 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). Intent is irrelevant to a claim of unfair and deceptive trade practices under N.C.G.S. §75-1.1. *See Wilder v. Squires,* 68 N.C.App. 310, 315 S.E.2d 63 (1984). Good faith is not a defense to unfair trade practice claims. See *Gray v. N.C. Ins. Underwriting Association,* 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).

If all businesses interacted in the way Andrews interacted with both ILG and USAT, there would be no trust between businesses or business persons. Andrews conduct exhibited a

pattern of building trust in ILG's abilities by promising
Andrews continued support and guarantees ILG would survive.  JA
1471, ¶4; JA 1472, ¶15; JA 2096:1-2098:16.  These facts show
Andrews did not intend such continued support and was incapable
of providing such support. Further, Andrews' failure to follow
acknowledged corporate wind-up and debt absolution process
violates public policy.  A director's unfair use of "positions
of superior knowledge" is tortious conduct.  North Carolina law
finds that using such intimate knowledge creates an inequitable
position in effecting commerce amounting to unfair and deceptive
trade practice.  See *Johnson v. Phoenix Mutual Life Insurance
Company*, 300 N.C. 247, 266 S.E. 2d 610 (1980). JA 271 Andrews's
unfair conduct included actions outside of his role of Chairman
and stockholder representative. Andrews brokered financing for
ILG, managed ILG's finances as a "consultant" and represented
some of ILG's creditors. JA 2099:12-3000:13. Andrews HEP
received $30,000.00 per month providing services in and
affecting commerce. North Carolina's Supreme Court found similar
conduct violates Chapter 75. *Sara Lee Corp. v. Carter*, 351 N.C.
27, 519 S.E.2d 308 (1999).  Andrews caused and was actively
involved in decisions to mislead USAT as to ILG's true financial
condition in order that ILG benefit from supply and inventory
based borrowing.  Further, Andrews, by and through numerous
agents including HEP Partners, Sheely and Sanchez, promised that

54

ILG's owners guaranteed payments to induce further supply.  ILG did not supply Plaintiff with truthful information, while using exclusive knowledge to benefit ILG and its officers, directors and shareholders. Andrews used his inequitable access to a knowledge of ILG's finances to benefit himself to USAT's detriment.

## CONCLUSION

The Court of Appeals should reverse the Trial Court's orders consistent herewith, and find that Andrews is liable for the $655,256.16 entered against ILG, plus interest ($179,522.23 and accumulating daily interest of $143.62), treble all damages proven in the record totaling $2,123,000.00 pursuant to N.C.G.S. 75-16 and award USA Trouser costs and attorney fees. In the alternative, the Court should remand the case so that a jury trial against Andrews be held.

This 2nd day of December, 2014.

/s/Matthew K. Rogers
Matthew K. Rogers
N.C. State Bar No.: 26992
*Counsel for Appellant*
Law Offices of Matthew K. Rogers, PLLC
P.O. Box 9096
Hickory, North Carolina 28603
Telephone: (828) 327-2005
Facsimile: (828) 327-7009

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed.
     R. App. 32(a)(7)(B) because:

          The word count of this brief is **12,035**.


2.   This brief complies with the typeface requirements of Fed.
     R. App. P. 32(a)(5) and the type style requirements of Fed.
     R. App. P. 32(a)(6) because:

     This brief has been prepared in a proportionally spaced
typeface using:

          Micro Soft Word, Courier New, 12 point.


December 2, 2014


                         /s/Matthew K. Rogers
                         Matthew K. Rogers

## CERTIFICATE OF SERVICE

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this December 2, 2014, filed the required copies of the foregoing Brief of Appellant in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Brief of Appellant using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Lindsey C. Boney, IV
BRADLEY ARANT BOULT CUMMINGS, LLP
1819 5th Avenue North
Birmingham, AL 35203-2104
Direct: 205-521-8914
Email: lboney@babc.com

Dana Clinton Lumsden
BRADLEY ARANT BOULT CUMMINGS LLP
Suite 2690
100 North Tryon Street
Charlotte, NC 28202
Direct: 704-338-6034
Email: dlumsden@babc.com


/s/Matthew K. Rogers
Matthew K. Rogers